John G. Balestriere*
Matthew W. Schmidt (Cal. Bar No. 302776)
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone: (415) 966-2656
Facsimile:   (212) 208-2613
john.balestriere@balestrierefariello.com
matthew.schmidt@balestrierefariello.com
*Attorneys for Plaintiffs*
*\*Pro hac vice application forthcoming*

Anastasia Mazzella (Cal. Bar. No. 245201)
**KABATECK LLP**
633 West Fifth Street, Suite 3200
Los Angeles, California 90071
Telephone: (213) 217-5007
Facsimile:   (213) 217-5010
am@kbklawyers.com
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIA HUBBARD and KAYLA GOEDINGHAUS,<br><br>Plaintiffs,<br><br>vs.<br><br>TRAMMELL S. CROW, JR., DR. BENJAMIN TODD ELLER, RICHARD HUBBARD, DR. MELISSA MILLER, DR. JOSEPH BOLIN, DR. SCOTT WOODS, DR. MRUGESHKUMAR SHAH, MICHAEL CAIN, COE JURACEK, PHILIP ECOB, H.J. COLE, TEXAS | Case No.:  2:22-cv-7957<br><br>COMPLAINT FOR VIOLATIONS OF THE TRAFFICKING VICTIMS PROTECTION ACT AND RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT<br><br><u>DEMAND FOR JURY TRIAL</u><br><br>11/01/2022 |

RANGER CODY MITCHELL, KURT KNEWITZ, PAUL PENDERGRASS, RALPH ROGERS, ROBERT PRUITT, SCOTT BRUNSON, CASE GROVER, RICHARD BUTLER, MARK MOLINA, MICHAEL HYNES, JR., SHAWN MAYER, JADE MAYER, RCI HOSPITALITY HOLDINGS, INC., INTEGRITY BASED MARKETING, LLC, STORM FITNESS NUTRITION, LLC, ULTRA COMBAT NUTRITION, LLC, ECOLOFT HOMES LLC, ELEVATED WELLNESS PARTNERS LLC, DOE INDIVIDUALS 1–20, and DOE COMPANIES 21–30

Defendants.

Plaintiffs Julia Hubbard ("Hubbard") and Kayla Goedinghaus ("Goedinghaus"), by their attorneys Balestriere Fariello, for their Complaint against Trammell S. Crow, Jr. ("Crow"), Dr. Benjamin Todd Eller ("Eller"), Richard Hubbard ("Rick"), Dr. Melissa Miller ("Miller"), Dr. Joseph Bolin ("Bolin"), Dr. Scott Woods ("Woods"), Dr. Mrugeshkumar Shah ("Shah"), Michael Cain ("Cain"), Coe Juracek ("Juracek"), Philip Ecob ("Ecob"), H.J. Cole ("Cole"), Texas Ranger Cody Mitchell ("Mitchell"), Kurt Knewitz ("Knewitz"), Paul Pendergrass ("Pendergrass"), Ralph Rogers ("Rogers"), Robert Pruitt ("Pruitt"), Scott Brunson ("Brunson"), Case Grover ("Grover"), Richard Butler ("Butler"), Mark Molina ("Molina"), Michael Hynes, Jr. ("Hynes"), Shawn Mayer ("Shawn Mayer"), Jade Mayer ("Jade Mayer"), RCI Hospitality Holdings, Inc. ("RCI"), Integrity Based Marketing, LLC, Storm Fitness Nutrition, LLC, Ultra Combat Nutrition, LLC, EcoLoft Homes LLC, Elevated Wellness Partners LLC, Doe Individuals 1–20, and Doe Companies 21–30 respectfully allege as follows.

## NATURE OF THE CASE

1. For nearly a decade or more, Defendant Richard Hubbard ("Rick") ran a sex and labor trafficking venture (the "Venture") for his financial gain, with the essential financial assistance and influence of environmental philanthropist Defendant Trammell S. Crow , Jr., and at least eight other prominent Texas businessmen.

2. To develop and run this successful Enterprise, including controlling the victims—who included at least Rick's then-wife Plaintiff Julia Hubbard ("Hubbard"), whom Rick made into a virtual long-term sex slave, his later fiancée Plaintiff Kayla Goedinghaus ("Goedinghaus"), whom he also had those in the Venture beat and rape, and others whose identities are unknown at this time—Rick utilized the essential services of numerous doctors, a prominent police officer, and others.

1

3.      Dozens of times, generally at "parties" (the "Forced Sex Parties") over the course of years, Rick forced Hubbard, Goedinghaus, and others to perform sex acts for payment, which payments he retained, and to secure business relationships.

4.      Rick used force, threats of force, fraud, or coercion to compel Hubbard and Goedinghaus to engage in commercial sex acts with the knowledge or reckless disregard of all Defendants, who each individually benefitted from the Venture.

5.      This force and threats included beatings to the point of hospitalization—twice Rick injured Hubbard's neck, requiring spinal surgery—and threats to harm Hubbard's and Goedinghaus's children, who were all under six years old at the time Rick, threatened them with the support of others in the Venture.

6.      Indeed, the misconduct and crimes of the Defendants were so egregious that the Venture became an illegal racketeering enterprise (the "Enterprise"), whereby the Defendants conspired together to commit various unlawful predicate acts, including coercion, human trafficking, dealing in controlled substances, and wire fraud, all of which proximately harmed Plaintiffs and almost certainly other victims.

*Dr. Todd Eller and the Medical Doctor Defendants*

7.      Key to Rick's control of Hubbard and Goedinghaus—and the essential functioning of the Venture—was the work of psychologist Dr. Benjamin Todd Eller ("Eller"), who lives and works in this District.

8.      Fully aware of the lies he was telling under oath for payment, Eller prepared false affidavits and other documents claiming that Hubbard and Goedinghaus were seriously psychiatrically troubled persons under his care and thus, he swore, required heavy doses of a variety of medications,

including Xanax, Adderall, Oxycodone, Marinol, Soma, Lorezapan, Ambien, and Trazadone.

9. This was a rank lie: Eller instead acted at Rick's behest in return for hundreds of thousands of dollars of payments over the course of years.

10. Further, while Eller claimed that Hubbard was his patient, they spoke only twice.

11. When Eller did speak with his "patients," Hubbard and Goedinghaus both informed Eller that Rick was fraudulently obtaining drugs in order to force them to commit sex acts. Hubbard and Goedinghaus asked for Eller's help.

12. Eller ignored these pleas for help.

13. Rick forced Hubbard and Goedinghaus to take these drugs in order to make them participate in the sex acts. Rick also would threaten to withhold Xanax and other drugs if not obeyed, causing both Hubbard and Goedinghaus to suffer potentially fatal seizures caused by withdrawal from Xanax and Clonazepam. And Plaintiffs believe they are not alone. Rick would regularly bring other women to the Forced Sex Parties that he met through the website Adult Friend Finder and other similar adult websites, and also encouraged Hubbard and Goedinghaus to bring women as well.

14. As a psychologist, Eller was unable to write prescriptions on his own. However, Rick found medical doctors who were willing to write prescriptions based on Eller's written recommendation. These physicians included Dr. Melissa Miller ("Miller"), Dr. Joseph Bolin ("Bolin"), Dr. Scott Woods ("Woods"), and Dr. Mrugeshkumar Shah ("Shah") (the "Medical Doctor Defendants").

15. It is not as if these doctors did not speak to the Plaintiffs; they did—but they ignored Plaintiffs' pleas for assistance, and, in the cases of Defendants Woods and Shah, ignored Hubbard's visible bruising, frequent

injuries, and frequent surgeries indicating physical abuse. Each of the Medical Doctor Defendants were informed by either Hubbard, Goedinghaus, or both that the drugs the Medical Doctor Defendants were prescribing were being used for an improper purpose, that Hubbard and Goedinghaus were being abused by Rick, and that Hubbard and Goedinghaus needed help.

16. None of the Medical Doctor Defendants took any action in response to these reports, and instead simply prescribed the drugs that Eller had requested in return for payment from Rick.

*The Fixer Defendants: Texas Ranger Cody Mitchell and Kurt Knewitz*

17. Rick's structured human trafficking Venture and racketeering Enterprise relied not just on these medical professionals, but on other "fixers"—including at least one law enforcement officer ironically charged with investigating human trafficking—to maintain and grow the illegal organization over the years.

18. In addition to the drugs provided by Eller and the Medical Doctor Defendants, Rick would also use beatings, choking, guns, and threats of legal process to cause Hubbard and Goedinghaus to do as he wished, often through the use of the Fixer Defendants: Texas Ranger Cody Mitchell and Kurt Knewitz (the "Fixer Defendants").

19. Rick's threats of legal process were assisted by Defendant Cody Mitchell, a longtime friend of Rick's and member of the elite Texas Ranger Division who specializes in human trafficking and child exploitation cases.

20. Rick had a close friendship with Mitchell and would regularly threaten Hubbard and Goedinghaus with arrest under false charges, telling them that if they did go to law enforcement, no one would believe them.

21. Rick informed Mitchell in detail of the operations of the Venture and provided him with naked photos of Hubbard and Goedinghaus.

22.     On one occasion, Rick shared with Hubbard a photograph that Mitchell had taken in his police cruiser and sent to Rick. In the photo, Mitchell was holding his penis in one hand and an open bottle of Jack Daniels whiskey in the other.

23.     This photo was presented as a threat to Hubbard: Mitchell considered himself above the law and would do what he needed to do to protect Rick and the Venture.

24.     The Venture also relied on another friend of Rick's, oil and gas investor Defendant Kurt Knewitz, who recruited Hubbard to the Venture.

25.     Knewitz acted as a "fixer" to the Venture, playing the role of "good cop" as needed.

26.     In particular, Knewitz would reassure Hubbard when she was concerned about Rick's behavior, particularly early on in Hubbard's involvement in the Venture. Knewitz also attempted to keep Goedinghaus in the Venture by the same means.

27.     In return for Knewitz's assistance to the Venture, Rick forced Hubbard and Goedinghaus to perform sex acts with Knewitz. Knewitz also participated in many of the Forced Sex Parties, including many at which Hubbard was present.

28.     Later, to assist the work of Knewitz and Mitchell, the Venture even enticed Hubbard's ex-husband, Shawn Mayer, and his new wife, Jade Mayer, to assist the Venture by exercising control over Hubbard's children—at Rick's direction and the Venture's benefit—in exchange for cash payments and other benefits.

*Trammell Crow and the Other Investor Defendants*

29.     Essential to this operation was funding to run the general operations and provisioning of the Plaintiffs and others, as well as to pay Eller and the Medical Doctor Defendants, and accrue profits to Rick himself.

30. The key financial supporter of the enterprise was Defendant Trammell S. Crow, Jr., a billionaire philanthropist and prominent member of the Dallas community whom Hubbard had known before meeting Rick.

31. Crow was involved at the very start of the Venture in 2010, knew full well all the details of the force, fraud, threat, and coercion which Rick used (in substantial part due to his prior relationship with Hubbard), and without him the Venture never could have succeeded, or indeed, ever gotten started.

32. Almost as much as Rick, Trammell was a key to the Venture's existence and long running success.

33. Once Hubbard introduced Crow to Rick, Rick ingratiated himself with Crow.

34. Rick convinced Crow to invest in the Venture, which Crow did. In return, Rick would traffic Hubbard and Goedinghaus to Crow, would supply drugs for Crow's parties, would force Hubbard to have sex with Crow's then-girlfriend in front of Crow (which Rick and Crow both videotaped and was used both for Crow's enjoyment and to threaten Hubbard), would force Goedinghaus to have sex in front of Crow (during the course of one Forced Sex Party over the course of several days), and would traffic other victims of the Venture to Crow at the "parties" on dozens of occasions over the course of years.

35. Crow's lifestyle meshed well with Rick's activities, as Crow enjoyed hosting drug-fueled parties, which were attended by many of the Investor Defendants (identified below) and others, including other victims of the Venture that Rick would bring to the parties. Crow particularly enjoyed the use of cocaine, so much (according to Rick) that he had his housekeeping staff fill containers in his home with cocaine, and refill as needed on a daily basis.

36.     Hubbard told Crow that Rick was forcing her to perform sex acts and forcing her to take drugs to induce such acts.

37.     However, Crow had grown to enjoy Rick's services and took no action to either help Hubbard or stop doing business with Rick and the Venture.

38.     In addition to the direct financial benefit from Crow, Rick and Crow benefitted from working together to get others to join the Venture as co-investors and clients.

39.     The Venture's list of Investor Defendants grew to include the following, all of whom either knew or recklessly disregarded the fact that Rick was using force, threats of force, fraud, or coercion to cause Hubbard and Goedinghaus, and others, to engage in sex acts; knowingly supported the Venture in its activities (including, but not limited to, by providing funding to the Venture); and received benefits from the Venture (including, but not limited to, receiving sex and media of naked women or individuals engaged in sex acts).

40.     The Investor Defendants include:

- **Scott Brunson** (Owner, Luna Pietra LLC): Brunson supported the Venture by providing at least $27,000 in financial support for the Venture, had knowledge of the Venture's acts by attending parties at which at Goedinghaus was forced to perform sex acts, and benefitted by Rick forcing Goedinghaus to perform sex acts with Brunson.

- **Michael Cain** (President and Executive Producer, M3 Films, LLC): Cain supported the Venture by providing financial support and drugs to the Venture, had knowledge of the Venture's acts by attending parties in which at least Hubbard was forced to

7

perform sex acts, and benefitted by Rick forcing Hubbard to perform sex acts in front of Cain.

- **H.J. Cole** (Founder of HJ Cole & Associates): Cole supported the Venture by providing drugs to the Venture, had knowledge of the Venture's acts by attending parties in which at least Hubbard was forced to perform sex acts, and benefitted by Rick forcing Hubbard to perform sex acts with him.

- **Philip Ecob** (President, Twynym Capital): Ecob supported the Venture by providing financial support to the Venture, had knowledge of the Venture's acts including the Forced Sex Parties, and benefitted through his employment at Crow Holdings Capital, Crow's family company, where Ecob was well compensated, in part to maintain his silence regarding what he knew about Crow's Forced Sex Parties.

- **Coe Juracek** (Senior Managing Director, Crow Holdings Capital): Juracek supported the Venture by providing financial support to the Venture, had knowledge of the Venture's acts including the Forced Sex Parties, and benefitted by receiving naked photos of Hubbard. Juracek also benefitted from his employment at Crow Holdings Capital, where Juracek was well compensated, in part to maintain his silence regarding what he knew about Crow's Forced Sex Parties.

- **Paul Pendergrass** (Owner of P³ LLC): Pendergrass supported the Venture by providing more than $250,000 to the Venture, had knowledge of the Venture's Forced Sex Parties and the events that occurred at those parties, and benefitted by expectation of receiving funds from the Venture and receiving naked photos of Hubbard.

- **Robert "Bob" Pruitt** (President of Data Center Equipment & Support, LLC): Pruitt supported the Venture by providing financial support to Rick and the Venture, including employing Rick and paying Rick's utility bills. Rick forced Hubbard to provide naked photographs of herself to Pruitt and to perform sex acts with Pruitt.

- **Ralph Rogers** (Real estate investor): Rogers supported the Venture by providing significant financial support to Rick to support the Venture, in the form of cash, supplying drugs to the Venture, and allowing Rick to live rent free on his property since 2018. Rogers had knowledge of the Venture's acts by attending parties in which Goedinghaus was forced to perform sex acts and had knowledge of the Forced Sex Parties in which Hubbard was forced to have sex, and benefitted by Rick allowing Rogers to watch Goedinghaus performing sex acts and received naked photos of Hubbard.

*The Labor Trafficking Defendants*

41.     Hubbard finally left Rick in March 2017, moving out due to the abuse. However, the scope of Rick's work in establishing and running a now-well-funded human trafficking Venture that relied on the support of medical and law enforcement professionals prevented Hubbard from fully escaping the Venture.

42.     Instead, Rick and the Venture continued to unlawfully benefit by labor trafficking Hubbard even after she no longer lived with Rick.

43.     Specifically, Case Grover, Marc Molina, Richard Butler, RCI Entertainment, Inc., and Michael Hynes, Jr. (the "Labor Trafficking Defendants") all benefitted by knowingly receiving the labor of Hubbard

through means of force, threats of force, physical restraint, serious harm, or threats of such means.

44.     Grover, Molina, and Butler were all managers at Silver City Cabaret (the "Cabaret"), a gentleman's club in Dallas, Texas that is owned by RCI Entertainment, Inc.

45.     Grover forced Hubbard to work at the Cabaret, confiscating a portion of her wages for his personal benefit with the knowledge of Molina, Butler, and RCI Entertainment, Inc.

46.     Grover would cause Hubbard to perform such work through physical abuse and threats, including beating Hubbard so hard that Hubbard suffered multiple broken ribs and threatening Hubbard with guns, including an AK-47 which Grover brought to Hubbard's home and fired repeatedly. Grover even intentionally crashed and totaled Hubbard's car so that she was further dependent on Grover for transportation.

47.     Grover was also in regular contact with Rick, exchanging information concerning Hubbard for their mutual benefit and the advancement of the Venture. Grover would also threaten to "give [Hubbard] back" to Rick if she disobeyed him.

48.     After Hubbard fled Grover, she was further labor trafficked by Michael Hynes, Jr., on behalf of the Venture. Hynes forced Hubbard to sell drugs for his financial benefit at various clubs owned by RCI Hospitality Holdings, Inc., called XTC and Temptations. Hynes also, at Rick's urging, would force Hubbard to have sex with Hynes in front of his drug dealer in exchange for drugs.

49.     Hynes caused Hubbard to comply through both physical harm and the threat of legal process from his father, Police Officer Michael Hynes, Sr., a member of the Fort Worth Police Department, who led Hubbard to

believe that she would be safe by virtue of his position. However, Hubbard was wrong.

50.    Just like Grover, Hynes was in regular contact with Rick and would trade information on Hubbard's whereabouts with him, so that Rick could assist in and benefit from Hynes's labor trafficking of Hubbard. Like Grover, Hynes would also threaten to "give [Hubbard] back" to Rick if she did not do as Hynes demanded.

51.    Hubbard eventually escaped the Venture in November 2018.

52.    Plaintiff Goedinghaus, meanwhile, escaped from the Venture in January 2020.

## JURISDICTION AND VENUE

53.    Venue is appropriate in the Central District of California as Defendant Eller resides and operates his business in the District and his acts were central to and essential to the work of the Venture described herein.

54.    This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964(a), which provides the district courts of the United States jurisdiction over violations of 18 U.S.C. § 1962.

55.    This Court also has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1595, which provides the district courts of the United States jurisdiction over violations of 18 U.S.C. § 1591.

56.    This Court also has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1030(g), which provides the district courts of the United States jurisdiction over violations of 18 U.S.C. § 1030.

57.    This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(a), as those claims form part of the same case or controversy as the related federal claims over which this Court has original jurisdiction.

58.    This Court has personal jurisdiction over the parties, as the actions that constitute the violations of 18 U.S.C. § 1962(c) and (d) were made possible by the acts of Defendant Eller, which occurred in this District. Further, the Court has personal jurisdiction over each Defendant because each Defendant who does not reside in this District purposefully availed themselves of the legal protection of the State of California and purposefully directed business to this State.

59.    Moreover, nationwide service of process is conferred by 18 U.S.C. § 1965(b) for violations of 18 U.S.C. § 1962 as long as the Court has personal jurisdiction over at least one party.

## **PARTIES**

### *Plaintiffs*

60.    Plaintiff Julia Hubbard is an individual who resides in Fairfax, Virginia.

61.    Plaintiff Kayla Goedinghaus is an individual who resides in Fairfax, Virginia.

### *Defendants*

62.    Defendant Trammell S. Crow is an individual who resides in Dallas, Texas.

63.    Defendant Dr. Benjamin Todd Eller is an individual who resides in Santa Monica, California.

64.    Defendant Richard Hubbard is an individual who resides in Marble Falls, Texas.

65.    Defendant Dr. Melissa Miller is an individual who resides in Texas.

66.    Defendant Dr. Joseph Bolin is an individual who resides in Plano, Texas.

67. Defendant Dr. Scott Woods is an individual who resides in Texas.

68. Defendant Dr. Mrugeshkumar Shah is an individual who is currently incarcerated at FCI Butner in Butner, North Carolina.

69. Defendant Michael Cain is an individual who resides in Dallas, Texas.

70. Defendant Coe Juracek an individual who resides in Dallas, Texas.

71. Defendant Philip Ecob an individual who resides in Dallas, Texas.

72. Defendant H.J. Cole an individual who resides in Dallas, Texas.

73. Defendant Texas Ranger Cody Mitchell an individual who resides in Austin, Texas.

74. Defendant Paul Pendergrass is an individual who resides in Texas.

75. Defendant Ralph Rogers is an individual who resides in Marble Falls, Texas.

76. Defendant Robert Pruitt is an individual who resides in Plano, Texas.

77. Defendant Scott Brunson is an individual who resides in the Greater Austin area of Texas.

78. Defendant Case Grover is an individual who resides in McKinney, Texas.

79. Defendant Richard Butler is an individual who resides in Dallas, Texas.

80. Defendant Mark Molina is an individual who resides in Dallas, Texas.

81. Defendant Michael Hynes, Jr. is an individual who resides in Mansfield, Texas.

82. Defendant Shawn Mayer is an individual who resides in Justin, Texas.

83. Defendant Jade Mayer is an individual who resides in Justin, Texas.

84. Defendant RCI Hospitality Holdings, Inc. is a Delaware corporation with a principal place of business in New York.

85. Integrity Based Marketing, LLC is a Texas limited liability company with a principle place of business in Marble Falls, Texas.

86. Storm Fitness Nutrition, LLC is a Texas limited liability company with a principle place of business in Marble Falls, Texas.

87. Ultra Combat Nutrition, LLC is a Texas limited liability company with a principle place of business in Marble Falls, Texas.

88. EcoLoft Homes LLC is a Texas limited liability company with a principle place of business in Marble Falls, Texas.

89. Elevated Wellness Partners LLC is a Texas limited liability company with a principle place of business in Marble Falls, Texas.

90. Doe Individuals 1 through 20 are fictitiously-named individuals whose identities will be discovered during the course of litigation.

91. Doe Companies 21 through 30 are fictitiously-named entities whose identities will be discovered during the course of litigation.

*Third-Parties*

92. Non-Party Police Officer Michael Hynes, Sr., is an individual who resides in Mansfield, Texas.

93. Non-Parties Laura Ellwell, Monique Farkas, Renee Heaton, Angela Pace, and Kim Ponder are believed victims of the Venture who reside in Texas.

94.     Texas Sunrooms and Windows is an unincorporated entity based in Texas and operated by Rick.

95.     Plaintiffs anticipate that discovery in this matter will reveal the identities of other victims of the Venture.

## STATEMENT OF FACTS

*Plaintiff Hubbard Meets and Marries Defendant Rick, through Fixer Defendant Kurt Knewitz*

96.     Hubbard met Rick in 2009 while in the middle of a custody battle over two children from her previous marriage with Defendant Shawn Mayer.

97.     Hubbard and Rick quickly entered into a relationship, and Rick moved in with Hubbard after just a few weeks of knowing her, as she found him charming and agreeable. They married in February 2010 and had a daughter later that year.

98.     Hubbard met Rick through Defendant Kurt Knewitz, a man she met on Facebook and dated briefly.

99.     Knewitz and Rick, Hubbard discovered, were extremely close friends from college, and later learned that Knewitz was acting as a recruiter for Rick. Knewitz also later bragged about having attended sex parties with Rick for many years.

100.    Early in the relationship, things were going well. Rick acted like a "hero" to Hubbard, saving her from the poor circumstances she was in before.

*Financial Difficulties Lead Rick to Defendant Dr. Eller*

101.    Rick's desire to act like a "hero" gradually became controlling.

102.    Rick began to take financial control in the relationship, including controlling all financial accounts, making Hubbard completely dependent on him.

103.   Rick initially expressed this need for financial control as a desire to protect and provide for his new, pregnant wife. Hubbard, who had been raised in a conservative Mormon household, at first thought this desire was normal and even gallant.

104.   However, Rick's ability to provide hit a snag when, during their first year of marriage in 2010 when Hubbard was still pregnant, he was arrested for financial fraud.

105.   Rick's arrest was in connection with a company he owned, Texas Sunrooms and Windows, for which he was charged with felony misappropriation of fiduciary property after scamming an elderly woman out of $3,400. Rick pleaded guilty in exchange for a fine, restitution, and three years' probation.

106.   Following his arrest, Rick became increasingly desperate to improve his financial situation.

107.   As Rick saw himself as a successful business owner, he refused to seek employment, but rather sought to start a successful new business. However, this proved harder than Rick had expected, and Rick quickly became frustrated.

*Rick Begins to Pressure Hubbard to Attend Sex Parties*

108.   Seeking an outlet for his financial frustrations, in 2010, Rick began expressing a desire for Hubbard to engage in "swinging" as he called it. Rick described this as something that he had done in the past and would involve Rick and Hubbard going to "swinger parties" where they would each meet and have sex with other people.

109.   This made Hubbard extremely uncomfortable.

110.   Rick, however, was persistent, and spoke at length of how it was important to "break free" of the "social construct" of monogamy, as well as the "religious indoctrination" of Hubbard's strict conservative upbringing.

111.  Rick also promised that he would never force Hubbard to do anything that she was not comfortable with.

112.  Wanting to please her new husband, Hubbard reluctantly agreed to try out swinger parties with Rick.

113.  While Hubbard did not enjoy them, these parties, at first, were as Rick had promised: they were infrequent and consensual.

*Rick Meets Defendant Dr. Eller and the Venture Begins*

114.  Meanwhile, by early 2011, Rick's financial fortune had failed to improve.

115.  However, Rick was not deterred, and continue to invest time and money into a marketing program called Chet Holmes International.

116.  Through the program, Rick met Dr. Benjamin Todd Eller, a psychologist who lived and worked in Santa Monica, California. In 2012, Rick began using Eller's services as a "business consultant" to advise him in the Chet Holmes methods.

117.  Dr. Eller had a respectable background. He held a PhD from the University of California Los Angeles, where he had taught and also worked for the university's National Center for the Study of Evaluation, a highly respected research center for developing methods for child education which are then used by K–12 schools throughout the country. He also is currently a professor at West Coast University. Eller also periodically appears as a television commentator.

118.  Eller also had an entrepreneurial streak of lending his credentials to various enterprises: he is a co-founder of Devotional Connection, a Christian devotional social networking service, and Chief Educational Officer of BabyFirst TV, a children's television production company, which used Eller's educational psychology background to promote programs such as "Harry the Bunny," "Peekaboo,"

"VocabuLarry," and "Clor Crew," available through the company's app and certain Hulu plans.

119.  However, despite his experience, and being engaged as Rick's "business consultant," Eller failed to help Rick form a successful legitimate business.

120.  Instead, Rick and Eller realized that they could make much more money by trafficking women to wealthy businessmen. To do so, they took the initial steps in creating the Venture.

*Rick and Eller Begin to Build the Venture*

121.  Building a successful sex and labor trafficking venture required work.

122.  First, the Venture needed women to traffic, but Rick was ready and willing to traffic his wife, Hubbard. While Rick knew that Hubbard would not agree to this, Rick realized that he could use the sex parties they had been arranging as a cover.

123.  Still, Rick knew that he would need Hubbard to attend far more sex parties in order for the Venture to be as profitable as he wished. This was where Eller came in: Eller would fraudulently use his psychological practice to force Hubbard to engage in commercial sex at parties—the Forced Sex Parties.

124.  Rick and Eller's scheme worked like this: Eller would claim that Hubbard was his patient and had serious psychological issues requiring heavy medication. Rick would then procure high doses of drugs, including Xanax, Adderall, Oxycodone, Marinol, Soma, Lorezapan, Ambien, and Trazadone, and force Hubbard to take them in high doses order to make her pliable. Rick kept these drugs in what he called his "prescription bar."

125. For these services Rick paid Eller a monthly fee ranging from $2,500 to $5,000, resulting in what Plaintiffs believe to be hundreds of thousands of dollars in payments to Eller over the years.

126. Below is an example of one such partial payment to Eller. Rick sent the below screenshot to Goedinghaus to show her that he had paid Eller.



127. Such drugs as Eller recommended, especially when mixed together and in high doses, made it both difficult for Hubbard to resist Rick's demands when she ingested the drugs, and, over time, their addictive nature would allow Rick further control over her life.

128. As an added benefit, Rick could also sell some of the drugs in order to obtain additional profit for the Venture.

129. Beyond the drugs themselves, Eller's credibility as a respected psychologist—including the very fact that he represented such drugs as necessary for Hubbard—gave Rick and the Venture even further control over Hubbard.

130.   As Eller knew very well, psychologists are given great deference when giving what they represent as their professional opinion, especially psychologists with a respectable professional background who insist that their patient needs medication. If Eller said that Hubbard was a danger to herself and her daughter, and particularly if he was willing to say so under oath, few people would believe Hubbard over him.

131.   Eller, having been a psychologist for decades, realized how powerful this was: it meant that Hubbard would be unlikely to be believed by the police or by courts, meaning that she had no recourse to anything that Rick might force her to do, and if she did try to resist, she was unlikely to retain any custody of her daughter. Any protests that Hubbard made would simply be dismissed as paranoid delusions.

132.   Below is an example of the type of signed documents that Eller would submit to courts. This is an excerpt that Eller submitted on October 3, 2019, to assist Rick in a failed attempt to bring Hubbard back to the Venture by maintaining control of Hubbard's children:

I have rarely disagreed with Rick's desires to maintain an open mind hoping that someday Julia will truly change and become the healthy, honest, and nurturing mother we all believed she could one-day be, but over the last 11 years of observations of these children, it is my professional opinion that even if she began counseling and rigorous inpatient behavior modification today, there is less than 10% chance that Julia Hubbard will ever be anything but a dangerous and destructive force to her children.  We believe the children's continued healthy environments and their chance to fully recover from the recent and past traumas is far too important to risk with ANY future contact with their mother. We highly recommend that Summer Hubbard should remain in the continued and exclusive custody of Rick Hubbard.

Benjamin Todd Eller, Ph.D.



133.   Years later, in 2022, when the family court judge in Hubbard's custody case had the opportunity to more fully hear matters, the court saw through these falsehoods alleged by Eller and, ultimately, granted Hubbard custody of her child and found Rick to have engaged in domestic and sexual abuse:

>                         THE COURT:  It's clear to me you have zero
> respect for anyone else.
>                         MR. HUBBARD:  That's not true.
>                         THE COURT:  You have no concern for your
> child's relationship with anybody else.
>                         THE COURT:  And then he can leave after
> that.  And that's the way it is.  You dug your own
> grave, Mr. Hubbard.  And it's become clear to me that
> you're not serving your daughter's best interest here.
> So that will be the order of the Court.

> **Conservatorship and Support**
>
> The Court, having considered the circumstances of the parents and of the child, finds that the following orders are in the best interest of the child.
>
> The Court finds that RICHARD HUBBARD has a history of domestic violence and sexual abuse, against JULIA HUBBARD within a two-year period preceding the filing of the
>
> IMMO Hubbard and ITIO S.L.H.                    Page 2 of 20
> Final Decree

134.   The court not only gave Hubbard full custody, it also barred Rick from any communication with his child except by pre-approved letters to a therapist—an extreme result reflecting the wrongdoing that the court saw from Rick.

135.   While Eller held himself out as Hubbard's psychologist, this was a rank lie: Eller exercised no professional judgment and simply did

1  whatever Rick asked him to. Many times, Rick would even draft a document
2  himself, and Eller simply signed what Rick presented to him.

3      136.  In fact, despite holding himself out as Hubbard's psychologist
4  for more than five years, Eller only met or spoke with Hubbard twice.

5      137.  Eller's work was essential to the Venture. Without Eller's work,
6  Hubbard (and later Plaintiff Goedinghaus) could not have been forced to
7  perform commercial sex acts, at least not close to the scale at which the
8  Venture operated.

9          *The Venture Adds the Medical Doctor Defendants*

10      138.  While drugs were essential to the Venture and key to Eller's role
11  in it, Eller could not supply the Venture without more help.

12      139.  Because Eller was not a medical doctor, he was unable to write
13  the prescriptions for the medications that were essential for the Venture. But
14  the Venture quickly found a way around this roadblock. Starting in Fall
15  2010, it located the Medical Doctor Defendants, four physicians who were
16  eager to write prescriptions based only on Eller's written recommendations
17  in exchange for payments from Rick.

18      140.  Below is an example of one such letter, from Spring 2019, in
19  which Eller did not even properly spell the name of Plaintiff Goedinghaus,
20  Eller's supposed patient:

21
22
23
24
25
26
27
28



**Best Practices, LLC**
Todd Eller, Ph. D. PD2857
364 West Wilson Ave
Suite 5
Glendale, CA 91203
(800) 598-7889

To whom it may concern,

Kayla Goodinghouse suffers from severe post-traumatic stress order and clinical depression. Her
episodes of fatigue, emotional exhaustion and crying have become more frequent. Kayla suffered
multiple traumas from childhood abuse, kidnapping and rape. She is currently on the following
medications:

- Zoloft
- Prazosin
- Ambilify

141.   The Medical Doctor Defendants constitute Dr. Joseph Bolin, Dr. Melissa Miller, Dr. Mrugeshkumar Shah, and Dr. Scott Woods.

142.   The Medical Doctor Defendants all knowingly provided essential support to the Venture, with knowledge or at least reckless disregard of its improper activities, in exchange for financial benefit.

143.   Each and every one of the Medical Doctor Defendants were informed by Plaintiffs that the drugs that the Medical Doctor Defendants were prescribing were being used for an improper purpose, that Hubbard and Goedinghaus were being abused by Rick, and that Hubbard and Goedinghaus needed help.

144.   None of the Medical Doctor Defendants took any action in response to these reports, and instead simply prescribed the drugs that Eller and Rick had requested.

145.   Specifically:

- **Shah**: A pain management doctor that Hubbard began seeing in or about 2013. Shah and staff would issue prescriptions without questions. Shah was later found guilty at trial for a $200 million medical kickback and bribery scheme separate from the Venture and is currently serving a 42-month sentence in federal prison. Over the course of multiple visits in Summer 2014, Hubbard told Shah that she did not need the drugs and was being forced to engage in sex against her. Shah's actions constituted a dealing in a controlled substance, a predicate act under RICO.

- **Bolin**: Rick would also at times direct Hubbard to Bolin, who was Rick's primary care physician. Like Shah, Bolin would issue any prescription that the Venture required without issue. In Summer 2018 Hubbard told Bolin that she did not need the drugs and was being forced to engage in sex against her will.

Bolin's actions constituted a dealing in a controlled substance, a predicate act under RICO.

- **Woods**: Rick also directed Hubbard to Woods, a psychiatrist. Rick acted eager for Hubbard to visit Woods, and Woods appeared particularly eager to prescribe drugs without question. Woods repeatedly assured Hubbard that he would give her "whatever [she] need[ed]," even when she repeatedly showed up for appointments while visibly on drugs. Rick would pay Woods $100 per visit for this service. In 2017, Hubbard told Woods that she did not need the drugs and was being forced to engage in sex against her will. Woods's actions constituted a dealing in a controlled substance, a predicate act under RICO.

- **Miller**: Miller is a primary care physician who Rick forced Goedinghaus to visit starting in April or May 2019. Goedinghaus informed Miller that Rick was withholding her medications, thus forcing her into withdrawal, physically abusing her, including choking her out to the point of unconsciousness, and raping her, but Miller continued to provide drugs to Goedinghaus and provided no assistance. Miller's actions constituted a dealing in a controlled substance, a predicate act under RICO.

146. The Medical Doctor Defendants would prescribe large doses of a wide variety of medications, which allowed the Venture to function and should have caused the Medical Doctor Defendants to exercise further professional diligence, which they ignored in order to encourage the continued payments from the Venture.

147.   Plaintiffs had even informed all Medical Doctor Defendants that Rick, on occasion, withheld or stole all medications prescribed to Hubbard and Goedinghaus to punish them.

148.   But the Medical Doctor Defendants did not intervene or offer support in any other way, like recommend subsidized healthcare, as is typical for patients in Plaintiffs's financial position. The Medical Doctor Defendants were aware that Plaintiffs had no financial autonomy and were geographically isolated (where even a grocery store for basic supplies was thirty minutes away) and that their whereabouts and communication was monitored.

149. Even had Plaintiffs not informed the Medical Doctor Defendants of the Venture (which they did), the high doses prescribed without proper diligence alone was enough to place the Medical Doctor Defendants in reckless disregard of the fact that these drugs were being used for an improper purpose and reasonable diligence would have required further inquiry.

150.   The drugs prescribed also included the so-called "Holy Trinity" of an opioid (Oxycodone), a benzodiazepine (Xanax or Clonazepam), and a carisoprodol (Soma). In this combination, they present a high risk of overdose and death as well as an extremely high risk of addiction.

151. Below are examples of drugs prescribed by Medical Doctor Defendants Shah and Woods to Hubbard (this reflects only a portion of prescriptions filled at CVS; the Venture also filled prescriptions at other retailers including Krogers and Walmart):

| RX NUMBER | REL | NDC NUMBER | DRUG DESCRIPTION | PRESCRIBER NAME | DATE FILLED | QUANT DISP | PATIENT PD AMT | PAYER # | TP AUTHORIZATION # |
|---|---|---|---|---|---|---|---|---|---|
| 732605 | 0 | 50111064701 | FLUOXETINE HCL 10 MG CAPSULE | WOODS, MICHAEL S | 09/02/2015 | 30 | 15.93 | 32730 | 4892324509025G |
| 732607 | 0 | 00781107905 | ALPRAZOLAM 1 MG TABLET | WOODS, MICHAEL S | 09/02/2015 | 60 | 22.56 | 32730 | 4892299509024G |
| 732607 | 1 | 00781107905 | ALPRAZOLAM 1 MG TABLET | WOODS, MICHAEL S | 10/03/2015 | 60 | 22.56 | 32730 | 5105608510033G |
| 732607 | 2 | 00781107905 | ALPRAZOLAM 1 MG TABLET | WOODS, MICHAEL S | 11/02/2015 | 60 | 23.31 | 32730 | 5327868511021G |
| 732607 | 3 | 00781107905 | ALPRAZOLAM 1 MG TABLET | WOODS, MICHAEL S | 11/29/2015 | 60 | 23.31 | 32730 | 5552763511296G |
| 732607 | 4 | 00781107905 | ALPRAZOLAM 1 MG TABLET | WOODS, MICHAEL S | 12/26/2015 | 60 | 23.31 | 32730 | 5777974512269G |
| 734905 | 0 | 10722005601 | OXYCODONE HCL 10 MG TABLET | SHAH, MRUGESHKUMAR | 09/15/2015 | 180 | 92.36 | 32730 | 4977530509154G |
| 734906 | 0 | 00603258221 | CARISOPRODOL 350 MG TABLET | SHAH, MRUGESHKUMAR | 09/15/2015 | 60 | 30.39 | 32730 | 4977538509150G |
| 734908 | 0 | 00378265001 | AMITRIPTYLINE HCL 50 MG TAB | SHAH, MRUGESHKUMAR | 09/15/2015 | 60 | 11.49 | 32730 | 4977554509158G |
| 734908 | 1 | 00378265001 | AMITRIPTYLINE HCL 50 MG TAB | SHAH, MRUGESHKUMAR | 11/02/2015 | 60 | 12.47 | 32730 | 5331818511025G |
| 745989 | 0 | 10722005601 | OXYCODONE HCL 10 MG TABLET | SHAH, MRUGESHKUMAR | 11/10/2015 | 180 | 94.17 | 32730 | 5402472511109G |
| 745991 | 0 | 00603258221 | CARISOPRODOL 350 MG TABLET | SHAH, MRUGESHKUMAR | 11/29/2015 | 60 | 16.47 | 22415 | 1533362134820229999 |
| 745991 | 1 | 00603258221 | CARISOPRODOL 350 MG TABLET | SHAH, MRUGESHKUMAR | 12/26/2015 | 60 | 16.47 | 22415 | 1536001734970409999 |
| 745992 | 0 | 00378265001 | AMITRIPTYLINE HCL 50 MG TAB | SHAH, MRUGESHKUMAR | 11/10/2015 | 60 | 12.47 | 32730 | 5402513511105G |
| 745992 | 1 | 00378265001 | AMITRIPTYLINE HCL 50 MG TAB | SHAH, MRUGESHKUMAR | 12/07/2015 | 60 | 12.47 | 32730 | 5623288512070G |
| 752371 | 0 | 00378265001 | AMITRIPTYLINE HCL 50 MG TAB | WOODS, MICHAEL S | 01/19/2016 | 60 | 30.10 | 35410 | 1601960061580339999 |
| 752371 | 1 | 00378265001 | AMITRIPTYLINE HCL 50 MG TAB | WOODS, MICHAEL S | 02/16/2016 | 60 | 21.63 | 18980 | 1605140803790249999 |
| 752371 | 2 | 00378265001 | AMITRIPTYLINE HCL 50 MG TAB | WOODS, MICHAEL S | 03/17/2016 | 60 | 21.63 | 18980 | 1607702707060309999 |
| 752371 | 3 | 00378265001 | AMITRIPTYLINE HCL 50 MG TAB | WOODS, MICHAEL S | 05/02/2016 | 60 | 21.63 | 18980 | 1612366700110429999 |
| 752372 | 0 | 00781107905 | ALPRAZOLAM 1 MG TABLET | WOODS, MICHAEL S | 01/22/2016 | 60 | 16.90 | 27165 | 5060792997 |
| 752372 | 1 | 00781107905 | ALPRAZOLAM 1 MG TABLET | WOODS, MICHAEL S | 02/24/2016 | 60 | 16.90 | 27165 | 5094756617 |
| 752372 | 2 | 00781107905 | ALPRAZOLAM 1 MG TABLET | WOODS, MICHAEL S | 03/24/2016 | 60 | 16.92 | 27165 | 5132630940 |
| 752372 | 3 | 00781107905 | ALPRAZOLAM 1 MG TABLET | WOODS, MICHAEL S | 04/24/2016 | 60 | 23.31 | 32730 | 6875482604243G |
| 764734 | 0 | 00603258221 | CARISOPRODOL 350 MG TABLET | SHAH, MRUGESHKUMAR | 02/12/2016 | 60 | 13.91 | 22285 | 9995462602126G |

152. Below are examples of drugs prescribed by Medical Doctor Defendant Miller to Goedinghaus:

| RX NUMBER | REL | NDC NUMBER | DRUG DESCRIPTION | PRESCRIBER NAME | DATE FILLED | QUANT DISP | PATIENT PD AMT | PAYER # | TP AUTHORIZATION # |
|---|---|---|---|---|---|---|---|---|---|
| 845223 | 0 | 13107007001 | DEXTROAMP-AMPHETAMIN 10 MG TAB | HOLCOMB, WILLIAM L | 03/26/2019 | 60 | 36.67 | 36690 | 7084515903308G |
| 854599 | 0 | 00093738498 | VENLAFAXINE HCL ER 37.5 MG CAP | MILLER, MELISSA B | 05/15/2019 | 15 | 18.87 | 36690 | 9506599905156G |
| 854600 | 0 | 13107007301 | DEXTROAMP-AMPHETAMIN 20 MG TAB | MILLER, MELISSA B | 05/15/2019 | 60 | 31.83 | 36690 | 9507615905154G |
| 854601 | 0 | 51991070701 | ALPRAZOLAM 2 MG TABLET | MILLER, MELISSA B | 05/15/2019 | 60 | 22.22 | 36690 | 9507002905158G |
| 854608 | 0 | 70954001910 | PRAZOSIN 1 MG CAPSULE | MILLER, MELISSA B | 06/13/2019 | 90 | 17.73 | 36690 | 4899897906136G |
| 855303 | 0 | 55111015330 | ONDANSETRON HCL 4 MG TABLET | MILLER, MELISSA B | 08/06/2019 | 10 | 9.00 | 33010 | 6676490604 |
| 855304 | 0 | 13107002101 | HYDROCODONE-ACETAMIN 10-325 MG | MILLER, MELISSA B | 05/17/2019 | 12 | 11.16 | 36690 | 1813679905174G |
| 857400 | 0 | 50111033401 | METRONIDAZOLE 500 MG TABLET | MILLER, MELISSA B | 05/30/2019 | 14 | 11.00 | 36690 | 7089939905301G |
| 858099 | 0 | 00093738498 | VENLAFAXINE HCL ER 37.5 MG CAP | MILLER, MELISSA B | 06/24/2019 | 30 | 28.74 | 36690 | 9963678906242G |
| 860099 | 0 | 51991070701 | ALPRAZOLAM 2 MG TABLET | MILLER, MELISSA B | 06/14/2019 | 60 | 22.22 | 36690 | 5192695906146G |
| 860100 | 0 | 00555097302 | DEXTROAMP-AMPHETAMIN 20 MG TAB | MILLER, MELISSA B | 06/14/2019 | 60 | 31.83 | 36690 | 5087915906148G |
| 865565 | 0 | 51991070701 | ALPRAZOLAM 2 MG TABLET | MILLER, MELISSA B | 07/13/2019 | 60 | 22.22 | 36690 | 1256979907138G |
| 865566 | 0 | 00555097302 | DEXTROAMP-AMPHETAMIN 20 MG TAB | MILLER, MELISSA B | 07/13/2019 | 60 | 31.83 | 36690 | 1259800907136G |
| 869658 | 0 | 65862056099 | PANTOPRAZOL SOD DR 40 MG TAB | MILLER, MELISSA B | 08/05/2019 | 30 | 24.74 | 36690 | 3800085908051G |
| 869659 | 0 | 13107007201 | DEXTROAMP-AMPHETAMIN 15 MG TAB | MILLER, MELISSA B | 08/05/2019 | 30 | 24.69 | 36690 | 3800409908053G |
| 869660 | 0 | 43975033510 | DEXTROAMP-AMPHET ER 25 MG CAP | MILLER, MELISSA B | 08/05/2019 | 30 | 68.08 | 36690 | 3801194908067G |
| 869665 | 0 | 50111033401 | METRONIDAZOLE 500 MG TABLET | MILLER, MELISSA B | 08/05/2019 | 42 | 15.00 | 36690 | 3799522908054G |
| 869732 | 0 | 00093738498 | VENLAFAXINE HCL ER 37.5 MG CAP | MILLER, MELISSA B | 08/05/2019 | 30 | 28.74 | 36690 | 3928344908054G |
| 869738 | 0 | 13107006001 | ACETAMINOPHEN-COD #4 TABLET | MILLER, MELISSA B | 08/05/2019 | 21 | 13.77 | 36690 | 3939463908050G |
| 869739 | 0 | 51991070701 | ALPRAZOLAM 2 MG TABLET | MILLER, MELISSA B | 08/09/2019 | 45 | 24.06 | 27165 | 6680456244 |
| 874045 | 0 | 68180044101 | CEPHALEXIN 250 MG/5 ML SUSP | MILLER, MELISSA B | 08/28/2019 | 200 | 22.80 | 36690 | 7272424908282G |
| 874848 | 0 | 43975033510 | DEXTROAMP-AMPHET ER 25 MG CAP | MILLER, MELISSA B | 09/03/2019 | 30 | 68.08 | 36690 | 9739729909034G |
| 874869 | 0 | 51991070701 | ALPRAZOLAM 2 MG TABLET | MILLER, MELISSA B | 09/06/2019 | 45 | 18.91 | 36690 | 2888046909065G |
| 874870 | 0 | 13107007201 | DEXTROAMP-AMPHETAMIN 15 MG TAB | MILLER, MELISSA B | 09/03/2019 | 30 | 24.69 | 36690 | 1171928909031G |
| 875570 | 0 | 65862056099 | PANTOPRAZOL SOD DR 40 MG TAB | MILLER, MELISSA B | 09/05/2019 | 30 | 24.74 | 36690 | 2646036909059G |

153. In order to ensure she made her appointments, Rick would often send Hubbard calendar alerts for meetings with doctors (sometimes with misspellings, in the case of Defendant Bolin's name):

---------- Forwarded message ----------
From: Rick Hubbard <rickhubbard@gmail.com>
Date: Fri, Jan 23, 2015, 1:03 PM
Subject: Invitation: Dr Bolen-Plano appt @ Mon Jan 26, 2015 11:30am - 12:30pm (Julia Hubbard)
To: julia.a.hubbard@gmail.com <julia.a.hubbard@gmail.com>

more details »
Dr Bolen-Plano appt
When    Mon Jan 26, 2015 11:30am – 12:30pm Central Time
Where   Plano, TX, USA (map)
Calendar   Julia Hubbard
Who     • Rick Hubbard - organizer
        • Julia Hubbard

Going? Yes - Maybe - No    more options »
Invitation from Google Calendar

You are receiving this email at the account julia.a.hubbard@gmail.com because you are subscribed to calendar Julia Hubbard.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.



*The Fixer Defendants*

154. In addition to Defendants Rick, Dr. Eller, and the Medical Doctor Defendants, the next step in the development of the Venture was the employment of those to keep the Venture going, including people to fix problems as they came up. These roles were filled by the Fixer Defendants: Kurt Knewitz and Texas Ranger Cody Mitchell.

155. The Fixer Defendants operated to keep Hubbard and the Venture's other victims in line, including by way of threatening misuse of legal process.

156. Knewitz and Mitchell were old friends of Rick's dating back at least to college (according to Rick, Mitchell and Rick had been friends since childhood), when they would participate in sex parties together.

157. Defendant Knewitz, as discussed above, acted as a recruiter and reassuring presence, acting as a "good cop." He maintained a relationship with Hubbard in order to encourage her to seek his counsel when she became troubled by Rick's behavior. Then whenever Hubbard did speak with Knewitz to express concerns about Rick, Knewitz would convince her to stay with Rick.

158. Defendant Texas Ranger Mitchell served as the literal bad cop. He was a member of the elite and highly respected Texas Rangers Division,

where he in fact specialized in investigating human trafficking and child exploitation cases.

159.  Even among the Texas Rangers, Mitchell was high-profile—he was well known and, in 2020, was even featured in a Showtime mini-series about one of his cases, called *Outcry*.

160.  Rick made use of Mitchell early on to intimidate Hubbard—Rick told Hubbard that Mitchell had done research and that her former husband, Shawn Mayer, had been under "investigation" by the Texas Rangers for child exploitation.

161.  Rick used this to isolate Hubbard, and he even forced Hubbard to take a polygraph test to "prove" that Mayer had abused her and make her more dependent on Rick.

162.  Rick also sought, with the help of Mitchell, to report abuse in order to take custody of Hubbard's children with Mayer away from him in order to better control Hubbard.

163.  All of this made Mitchell an imposing threat. When Hubbard seemed like she may not obey Rick's demands, Rick would tell Hubbard that Mitchell could cause her to be arrested. Rick also repeatedly told Hubbard that if she did attempt to contact law enforcement, a call from Mitchell (as well as Eller) would quickly cause the police to disregard whatever Hubbard said.

*The Investor Defendants*

164.  Now that Rick and Eller had secured their essential means to control Hubbard and Goedinghaus, the next step was to secure funding.

165.  Here too, Rick was adept at seizing opportunities. In 2009, shortly after meeting Hubbard, he learned that Hubbard was friends with Defendant Trammell Crow, the son of a prominent Dallas real estate family.

166.   The Forced Sex Parties and related events that the Investor Defendants attended were so important to Rick that he would habitually send Hubbard calendar alerts in order to better organize the Venture. For example:



*Defendant Trammell Crow*

167.   As Rick knew, Hubbard had met Crow in 2009 while she was working as a waitress at Plush Nightclub in Dallas.

168.   Hubbard and Crow then became friends, with Crow inviting Hubbard to charity events and Hubbard in turn inviting Crow to modeling shows.

169.   Rick met Crow at one of these modeling shows in 2009, and later made efforts to ingratiate himself to Crow for his own advantage.

170.   As Rick knew, Crow was wealthy and closely connected to Dallas business interests.

171. The Crow family company, Crow Holdings, currently boasts $27 billion in assets under management, and was involved with the development of a number of iconic buildings thorough the United States, including the Embarcadero Center in San Francisco and the Peachtree Center in Atlanta.

172. Defendant Crow himself was more involved in other endeavors, focusing on environmental philanthropy. Crow is currently on the board of ConservAmerica and is involved with a range of other environmental nonprofits including the Texas Conservation Alliance, the Nature Conservancy of Texas, Texans for Public Lands, and the League of Conservation Voters. Crow also serves as president of the Crow Family Foundation, which in 2020 disbursed more than $45 million in charitable funding.

173. Crow also hosted various parties and social events, which were much-desired invitations, particularly for those who wished to rise in the ranks of the Dallas business community, as proximity to Crow and his guests could open many doors. Crow would even sometimes allow Rick to stay at Crow's home after the party.

174. For instance, Crow hosted a twice-annual camping event, in the fall and spring each year, called "Kiddie Campout" for fathers and their children. This event was so exclusive and well-known, requiring a personal invitation from Crow, that telling local businessmen that you went to the event would instantly confer credibility. This credibility benefit was especially pronounced for someone like Rick (who became an annual guest at the camp out due to the Venture), who otherwise lacked the markers of being an insider in this community.

175. This camp out was so important to Rick that he would send Hubbard calendar alerts for the date:



176. Crow's main project is EarthX, formerly called Earth Day Texas, which operates an annual expo showcasing environmental initiatives each year in April.

177. The annual EarthX expo is highly prominent. In 2018, a local Dallas magazine reported that the event included hundreds of vendors, thousands of visitors, dozens of politicians, and "some of the most prominent environmentalists on the planet," including the Secretary of Energy and Lieutenant Governor of Texas. The same articled described Crow as a "power broker in the environmentalist movement."

178. Due to the large amount of work that Crow put into the EarthX expo, afterwards he would always be looking to blow off steam and hosted a private afterparty each year. This event would eventually become one of most lucrative, in terms of development business relationships, Forced Sex Parties each year for the Venture, as it consisted of high-profile individuals looking to indulge themselves in a discreet environment—even its existence was considered secret.

179. The lifestyle of Crow and his friends was ideal for the Venture. Crow and his friends enjoyed recreational sex and drug use, and had money

and connections, but needed to keep such activities discreet due to their local prominence.

180. Crow was also very used to getting his way and having vices delivered to him—he had staff fill contains of cocaine (his favorite drug) in his home, and once told Hubbard that he had never even been to a liquor store, as he had always had liquor delivered.

181. Crow could be violent, impulsive, and reckless. On one occasion, he had a violent confrontation with one of his girlfriends that caused her to lose several teeth.

182. Crow maintained what he called "lingerie rooms" in each property he owned in which he kept a variety of lingerie for female guests to wear, as well as what he called "stripper shoes." Crow kept a range of sizes of such shoes, from size 4.5 at the smallest to size 9 at the largest (because, as Crow also explained to Hubbard, he did not want to be with a woman who had feet larger than a size 9). Crow even bought lingerie specifically in Hubbard's size for her to wear that he kept in his Dallas home, at Rick's urging.

183. Crow also maintained "gift rooms," in which he kept gifts for his guests, but especially female guests. These gifts prominently included children's gifts, intended for women with children—as Crow confided to Hubbard, he particularly favored having sex with women with children, so he sought to entice them. This also served Rick well, as he preferred to traffic women who had young children—including first Plaintiff Hubbard then Plaintiff Goedinghaus—as he could control them by threats of loss of custody.

184. Crow also maintained a "stripper pole" in his personal bathroom, which was typically off-limits to guests but that he allowed Goedinghaus to photograph herself with.

185. Hubbard told Crow that Rick was forcing her to perform sex acts and forcing them to take drugs to force such acts. However, Crow had grown to enjoy Rick's services and took no action to either help Hubbard or stop doing business with Rick and the Venture.

186. Crow was sufficiently involved in the Venture that he would often send text messages with Hubbard, or allow himself to be photographed with her:





187.   Rick, for his part, was eager to capitalize on Crow's success, including writing letters to ask for money, and even receiving information from Crow's accountant on how to best structure loans to the Venture.



**Integrity Based Marketing**
www.IntegrityBasedMarketing.com
Phone: 469-215-7355  Fax: 866-753-6330
14613 Kelmscot Drive Frisco, TX 75035

Trammell S. Crow
3526 Arrowhead Drive
Dallas, TX 75204

Dear Trammell,

I'm embarrassed to strain our relationship by asking you for financial assistance, but as they say...Desperate times call for desperate measures. I'm scared that my children are in danger and they need more help than I can provide on my own.

I spoke with Tom Raggio and he is confident that one of his partner attorneys Barbara VanDuyne can help us tremendously in this matter.  He also told me that he didn't know of any other less expensive young attorneys who could adequately handle our case.

I offered to pay their firm $5,000/month for as long as needed.  He replied that most of their efforts would be needed in the first 30 days so he said that he would have to insist on a min. $20,000 retainer and that he believed the total costs for all litigation would be in the $25,000 to $40,000 range.

I need your help and I have three brief offers I would like you to consider today with the ultimate goal of having you pay and/or lend me $25,000 dollars:

---------- Forwarded message ----------
From: **Rick Hubbard** <rickhubbard@gmail.com>
Date: Tue, Sep 9, 2014 at 1:59 PM
Subject: Notes for Trammell
To: Jon Parsons <jon@vmdtech.net>

Papa,
Phil Ecob and Trammell's accountant's ok'd the stock(notes) transfer to Trammell.  The gesture was very well received by all and I believe it will go a very long way towards firming up our family friendship and any business relationship with the Crow's in the future.  Trammell was admittedly getting frustrated that we had not repaid the loan yet, so it's good timing and an honorable gesture.  Thanks for your help with this.

The accountant (Gale Bennett) said this:
 "As discussed yesterday, Trammell would take this gift with carryover basis from Mr. Hubbard + he can increase his basis for part of any gift tax paid on the gift (meaning for purposes of determining gain or loss on disposition he has the same cost basis as Mr. Hubbard – no step up to FMV is allowed for a gift).  The main downside to Trammell is that he will pay income tax on the built-in-gain (if any) in the property when he sells the property.  Since he is not out any money, that may not be a big deal, but did want to point it out."

I originally told Phil and Trammell that the Fair Market Value(FMV) was $68/share, but since I am technically giving away 200 of my shares, I guess the cost-basis would be $34/share.  Not sure about this detail, but my understanding is that all the equity I've been working for has been valued at $34/share (same as Adwise, Jim, Simon, etc.). That being said, we owe Trammell $13k-$15K, so I wanted the value of the gift to be around that amount (200X$68=$13,600.00).  We can discuss later if you want to iron out details, but I think the value needs to match whatever value you're going to assign the notes you are going to pay me with.  You can decide and let me know, but the gift should be minimum of 200 notes as we discussed.

Please assign the notes to Trammell S. Crow and email signed notes to the following email addresses:

34

188. Crow and all of the Investor Defendants either attended at least one or knew about the Forced Sex Parties, which often involved large amounts of cocaine, GHB, MDMA, Oxycodone, Vicodin, Benzodiazepine, Adderall, and other illegal drugs, in addition to Plaintiffs being forced to perform sex acts.

189. Each of the Investor Defendants also paid Rick funds to support the Venture, and benefitted as a result.

190. These men were not just customers, they were also often investors in Rick's string of fraudulent businesses. These investments were a quid pro quo for the men to gain access to Rick's trafficking venture, and each of these men had either actual knowledge of or recklessly disregarded the fact that Rick was forcing Hubbard and Goedinghaus to engage in commercial sex, often because Hubbard or Goedinghaus had directly told them. The Investor Defendants also gave Rick and the Venture credibility: Rick would use their names and reputations to recruit others into the Venture.

*Defendant Scott Brunson*

191. Defendant Brunson is a sculptor and licensed builder, and owner of Luna Pietra LLC. He also supported his lifestyle through the sale of drugs.

192. In 2019, Brunson began to visit Rick and Plaintiff Goedinghaus in the evenings at the home they shared at the time, at 1605 Grayford Drive, Austin, Texas. From these visits, Brunson knew or, at a minimum, recklessly disregarded, the fact that Rick was forcing Goedinghaus to perform sex acts.

193. In April or May 2019, Rick informed Goedinghaus that she needed to "convince" Brunson to make a substantial investment in the Venture through Rick's company EcoLoft Homes LLC.

194. Rick threatened Goedinghaus by telling her that if she did not have sex with Brunson, Rick would choke her until she was unconscious—something Rick had done to her previously.

195. In response to this threat, Goedinghaus had sex with Brunson as Rick demanded, and in exchange, Brunson gave Rick $27,000 in cash in exchange for such commercial sex.

*Defendant Michael Cain*

196. Defendant Cain is a prominent film producer, whose work has won the Sundance Film Festival Special Jury Prize and has produced more than twenty films for HBO and Showtime.

197. Cain is one of Crow's closest friends and would attend Crow's Forced Sex Parties and bring drugs to them, including MDMA, when his wife was out of town.

198. At these Forced Sex Parties, Rick would force Hubbard to perform sex acts in front of Cain, while Cain had sex with other women at the parties.

199. In exchange, Cain provided financial support to the Venture in an amount unknown at this time.

200. Cain was so close to the Venture that he would even wish Hubbard a happy birthday on Facebook. Such a message had a dark undertone, since Rick would as a rule force Hubbard (and later Plaintiff Goedinghaus) to attend Forced Sex Parties on her birthday:

36

---------- Forwarded message ----------
From: **Facebook** <notification+kawsgqna@facebookmail.com>
Date: Mon, Sep 8, 2014 at 6:31 PM
Subject: Michael Cain mentioned you on Facebook
To: Julia Hubbard <julia.a.hubbard@gmail.com>

**facebook**

**Michael Cain** mentioned you in a comment.

Michael wrote: "Happy Birthday Julia Hubbard! I hope that you and Rick have a fantastic celebration!"

Reply to this email to comment on this photo.

**See Comment**

This message was sent to julia.a.hubbard@gmail.com. If you don't want to receive these emails from Facebook in the future, please unsubscribe.
Facebook, Inc., Attention: Department 415, PO Box 10005, Palo Alto, CA 94303

## *Defendant H.J. Cole*

201. Founder of Dallas real estate brokerage H.J. Cole & Associates, Defendant Cole bragged to Hubbard that he had worked for years as a drug dealer to further support his lifestyle.

202. One of Crow's closest friends, Cole would supply cocaine to Crow, both for Crow's Forced Sex Parties and personal use.

203. Cole also served as Rick's backup when Crow was busy or out of town and Rick desired to attend a Forced Sex Parties, Rick would then force Hubbard to go to Cole's home, where he would force Hubbard to perform sex acts, including sex with Cole.

204. On one occasion, Rick forced Hubbard to take a naked photo in Cole's home to send to Crow when Crow was unavailable to show that Rick and Hubbard were waiting for him. This was intended as an enticement to Crow to further associate with the Venture.

## *Defendant Philip Ecob*

205. Defendant Ecob, president of hedge fund Twynym Capital, previously worked at Crow Holdings Capital for more than 14 years and during all relevant times, until 2021.

206.   Ecob provided financial support to the Venture as well as social cachet, which Rick would use to further grow the Venture—Rick would brag to Hubbard whenever he had a meeting with Ecob.

207.   Ecob was aware of the Forced Sex Parties at which Hubbard was forced to perform sex acts, and knew or, at a minimum, recklessly disregarded, the fact that Rick was forcing Hubbard to perform sex acts. Rick also informed Hubbard that he had provided Ecob with naked photos of Hubbard.

208.   Ecob received benefit from the Venture at a minimum in the from having knowledge about the Forced Sex Parties and in his compensation from Crow Holdings Capital, where Ecob was well compensated, in part to maintain his silence concerning the Forced Sex Parties.

*Defendant Coe Juracek*

209.   Defendant Juracek, a Senior Managing Director at Crow Holdings Capital and member of its investment committee, also informally worked as Crow's "fixer," solving problems that came up in his personal life. Juracek also attended camp outs with Rick and Crow.

210.   Juracek provided financial support to the Venture as well as social cachet, which Rick would use to further grow the Venture.

211.   Juracek was aware of the Forced Sex Parties at which Hubbard was forced to perform sex acts, and knew or, at a minimum, recklessly disregarded, the fact that Rick was forcing Hubbard to perform sex acts. Rick informed Hubbard that he had provided Juracek with naked photos of Hubbard. Juracek also threatened Hubbard with his testimony in court that could have Hubbard's children taken away from her.

212.   Juracek also benefitted by having knowledge of the Forced Sex Parties and in his compensation from Crow Holdings Capital, where

Juracek was well compensated, in part to maintain his silence concerning the Forced Sex Parties.

*Defendant Paul Pendergrass*

213.  Defendant Pendergrass is a real estate investor and owner of investment company P³ LLC.

214.  Pendergrass supported the Venture by investing at least $250,000 in the Venture, paid by wire transfer, through Rick's company EcoLoft Homes LLC, with knowledge of the trafficking events that were occurring.

215.  Pendergrass also provided further funds to the Venture once Hubbard fled the Venture, to support Rick's effort to locate Hubbard.

216.  Pendergrass witnessed numerous Forced Sex Parties and met Rick and Goedinghaus at various AirBnBs in Summer 2019; then continuing in Summer 2019 at 501 Havana Street Austin, Texas. He would interrupt the parties, demanding the return of his funds

217.  In exchange, Rick forced Goedinghaus to perform sex acts in front of Pendergrass, and repeatedly offered to force Goedinghaus to have sex with Pendergrass.

*Defendant Robert Pruitt*

218.  Defendant Pruitt is the president of Data Center Equipment & Support, LLC.

219.  Pruitt provided financial support to the Venture, often in the form of paying for expenses at Rick's request, such as Rick's utility bill.

220.  Pruitt also employed Rick for a time at his company, the only full-time job the Rick ever held in the 12 years Hubbard or Goedinghaus knew Rick.

221.   In exchange, Rick would regularly send Pruitt naked photos of Hubbard. Pruitt would also tell Hubbard he would fire Rick if Rick did not send such photos.

222.   Hubbard would also meet with Pruitt in the 2010–17 time period, and Rick would force Hubbard to sit in Pruitt's lap, while Pruitt would grope Hubbard, smell her hair, and kiss her cheek.

223.   Pruitt would refer to himself as "Uncle Bob" to Hubbard and would refer to his meetings with Hubbard as "spending time with Uncle Bob."

224.   Rick would force Hubbard to send "thank you" texts to Pruitt after these encounters. For example:

1
2
3
4
5
6
7
8
9



10
11
12
13
14
15

16 *Defendant Ralph Rogers*

17    225.    Beginning in April 2019, Defendant Rogers allowed Rick and

18 Goedinghaus to live rent-free on his property at 28827 Fine Road, Marble

19 Falls, Texas, once Rick lost his previous home. Rick lives at this property to

20 this day. Rick boasts that this is a "lake house"—in order to lure investors

21 and victims to the Venture—but it is in fact a trailer that is not located on

22 any body of water.

23    226.    In exchange, Rick would host Forced Sex Parties at Rogers's

24 property, and would force Goedinghaus to "host" the parties while naked

25 or dressed in lingerie.

26    227.    Rick would also distribute naked photos of Hubbard to Rogers

27 and others—and then tell Hubbard that "everyone" had seen her naked.

228.  Rogers would watch Rick and Goedinghaus have sex at the Forced Sex Parties, while Rogers would masturbate and grope Goedinghaus.

*The Venture Involves Shawn and Jade Mayer*

229.  Defendant Shawn Mayer is the former husband of Hubbard. While early on in the Venture, Rick and Mitchell made exaggerated allegations concerning Shawn Mayer, by 2019 Rick had decided that Shawn Mayer and his new wife Jade Mayer could be useful to the venture.

230.  Specifically, Rick would provide to Shawn and Jade Mayer cash payments, hotel rooms, and gifts in exchange for following Rick's instructions concerning Hubbard's children, including assisting in withholding Hubbard's children from her and providing them to Rick as needed to attend an exclusive twice-yearly camping trip with Defendant Crow. Rick also instructed Shawn Mayer to not contact Hubbard. Shawn and Jade Mayer complied with Rick's requests despite Hubbard informing Shawn and Jade Mayer repeatedly by email and phone starting in or about March 2017 and consistently through 2019 and 2020 that Rick had sexually assaulted her and caused her to commit commercial sex acts by means of force.

231.  On the contrary, Shawn and Jade Mayer were eager to profit from Rick's payments. On one occasion in Summer 2019 when Rick was slow in making a promised payment, Shawn Mayer even caused Hubbard's eldest daughter to ask Rick for money.

232.  Shawn and Jade Mayer's actions also made more credible Rick's threats to harm Hubbard's children, including Rick's repeated threats—starting in 2012—that Rick would kill Hubbard's children to punish her.

233.  Shawn and Jade Mayer's actions would also later assist the Venture in forcing Goedinghaus to commit sex acts, as in or around July

2019, Rick would be sure to have discussions with Shawn and Jade Mayer concerning Hubbard's children in Goedinghaus's earshot.

234.   Rick would then further convey this to Goedinghaus as a threat: if Goedinghaus did not obey Rick and the Venture, Rick would also take control of her child away from her as he had successfully done with Shawn Mayer and Hubbard's children.

*Rick Escalates the Venture's Activities*

235.   Ultimately, Rick founded a series of companies across a variety of supposed industries—with names such as Integrity Based Marketing, LLC (registered in Texas in 2013); Storm Fitness Nutrition, LLC (registered in Texas in 2014); Ultra Combat Nutrition, LLC (registered in Texas in 2014); EcoLoft Homes LLC (registered in Texas in 2017), and Elevated Wellness Partners LLC (registered in Texas in 2017), as well as the unassociated entity Texas Sunrooms and Windows.

236.   However, none of these "businesses" ever had employees or actual operations. Instead, they were simply fronts for Rick to process funds for the Venture, which became his only means of financial support.

237.   Rick began subtly, not telling Hubbard that sex was being exchanged for money at sex parties—thus causing Hubbard to engage in commercial sex acts by means of fraud. Rick would only provide Hubbard with seizure-stopping medicine if she complied with his requests.

238.   By 2012, Rick had dropped any pretense of requiring Hubbard's consent for the Forced Sex Parties and had begun openly assaulting and threatening Hubbard in order to cause her to attend the Forced Sex Parties and perform sex acts at them. Rick's behavior further escalated over time, becoming more violent.

239.   The methods of force that Rick used included physically beating Hubbard. These beatings reached such levels that Hubbard suffered a broken arm, and two separate neck surgeries in 2014 and in 2015 or 2016.

240.   Before one of these neck surgeries, in 2014, doctors warned Hubbard that she could have become a quadriplegic from the injuries that Rick had inflicted.

241.   Another time, Hubbard needed abdominal surgery for torn intestinal lining after an injury caused by Rick. On another occasion, in March 2017, Rick put a gun to Hubbard's head and threaten to kill her.

242.   Rick would also engage in heavy drug use himself, often with the drugs prescribed by the Medical Doctor Defendants, and tell stories about how he fantasized about killing people. This erratic behavior concerned Hubbard, as it made it more likely that Rick may kill her or harm her children in a fit of rage if she did not comply with his demands.

243.   Rick also forced Hubbard to be sterilized on October 29, 2010, having tubal ligation performed after she gave birth to their child without her consent. After this, Rick used it as an enticement, telling Hubbard that if she sufficiently complied with his demands, he might pay to have the procedure reversed. Rick would also tell Hubbard that she couldn't leave because no one else would "want [her]" since she could no longer have children.

244.   Rick also would drink heavily and force Hubbard to drink heavily as well, then when intoxicated would record videos of her and use them to threaten to portray her as an alcoholic to any police and courts as well as to Hubbard's family and friends, and to other members of the Venture.

245.   As time went on, Rick's behavior became even more alarming. He would tell Hubbard that he was aroused when she cried and talked

about his "greatest fantasy" of breaking into people's homes and raping them. He also spoke of hiring someone to violently rape Hubbard while he watched.

246. Rick would also talk regularly about building a "bunker," and Hubbard would see Google searches on his computers for topics such as how to bury bodies, further putting Hubbard in fear of Rick's actions.

*Hubbard Leaves Rick and Subsequent Abuse and Labor Trafficking*

247. Hubbard left Rick in March 2017—after one occasion where he held a gun to her head and threatened to kill her, Hubbard realized that she must escape Rick.

248. However, the scope of the Venture meant that she had not escaped the Venture. Instead, Rick still unlawfully benefitted from Hubbard by carrying out labor trafficking through other members of the Venture.

249. After leaving Rick, to support herself Hubbard found work in summer 2017 as a waitress at Silver City Cabaret (the "Cabaret"), a gentleman's club in Dallas Texas that was owned by Defendant RCI Entertainment, Inc. There she met Defendant Case Grover, a manager at the Cabaret.

250. Grover quickly began to display traits similar to Rick, using a combination of forcing dependency and physical violence to force Hubbard to do as he wished for his financial benefit. This included forcing Hubbard to do extra work, including Grover's managerial duties and for a time working as a dancer at the Cabaret. Grover then would refuse to disburse Hubbard's wages to her.

251. Shortly after Hubbard began working at the Cabaret, Grover began using physical abuse and threats to Hubbard, including repeatedly threatening her with guns, including an AK-47 which he brought to her home and fired repeatedly. At one point, in October 2017, Grover beat

45

Hubbard so badly that he broke her ribs, causing multiple fractures and contusions:

**Follow-up Information (continued)**
Why: As Needed
Contact information
1411 N Beckley Ave
Ste 152
Dallas TX 75203-1586
214-884-4700

## Other info from Your Visit
**Diagnosis**
 Two Posterior rib fractures, multiple rib contusions, left (9,10) initial encounter, Cervical radiculopathy.

**Procedures and Tests Performed During Your Visit**
 X-ray Ribs 2 View Left
**Providers Who Cared for You**
 Garry F Gagnon, MD

252.   Grover would use his power as Hubbard's manager to compel her to follow his demands, threatening to cut her hours or fire her if she did not comply, or did anything without his consent, including small tasks such as grocery shopping alone. Grover also demanded that Hubbard ask permission to use her phone and keep location services turned on so he could track her—if she turned the location services off, Grover would arrive at her home within 20 minutes.

253.   Grover also at one point insisted on driving Hubbard's car and intentionally crashed it. Grover then insisted on driving Hubbard to work (and anywhere else she would go) himself.

254.   Hubbard reported Grover's behavior to other managers at the Cabaret, including Defendant Molina, the club's waitress manager, and Defendant Butler, the Cabaret's owner. None of them took any action. However, Butler did repeatedly ask Hubbard for sexual favors and threatened to fire her if she did not comply.

255.   Hubbard learned that Grover was part of the Venture and had been in regular contact with Rick since Hubbard had begun working at the Cabaret—in fact, Rick was even in touch with Grover's wife.

256.   Indeed, on one occasion in Fall 2017, Rick came to visit Hubbard and offered to allow her to see her daughter, but only in exchange for all of the earnings that Hubbard made that day at the Cabaret and on the condition that Hubbard would have sex with Rick. This request showed that Rick knew that Grover was himself confiscating Hubbard's wages, and Rick knew that such a demand was impossible.

*Hubbard Meets Michael Hynes, Jr., Who Further Labor Traffics Hubbard*

257.   After Grover broke Hubbard's ribs in October 2017, she left him and quit her job at the Cabaret. In pain from the broken ribs and still addicted to some of the drugs that Rick had made her take, Hubbard was highly vulnerable and even suicidal.

258.   Around this time, a man named Michael Hynes, Jr., ("Hynes") had been messaging Hubbard on Facebook. On December 26, 2017, Hubbard responded to one of Defendant Hynes's messages, and Hynes came to meet Hubbard for a date at her home.

259.   As Hubbard would only learn later, Hynes was in fact a member of the Venture. In fact, Hynes had for years been selling the drug GHB to Fixer Defendant Knewitz, who in turn had supplied the drug to the Forced Sex Parties that Rick had forced Hubbard to attend.

260.   Initially, Hynes appeared safe and reassuring. His father, Michael Hynes, Sr. ("Hynes Sr."), was a member of the Dallas Fort Worth Police Department, which led Hubbard to believe that she would be safe. Hynes also told Hubbard that he was in the military and would occasionally leave for "special assignments."

261.   However, it later became apparent that this was an outlandish lie or delusion. Hynes had no military experience, and his "special assignments" in fact were him going on private meth binges, a drug he was addicted to.

262.   Over time, Hynes's delusions became even more disturbing. He insisted that he had lost his arm in an explosion, and the government had given him a new arm using "nanotechnology." Hynes would brag that if he was injured, the military-grade "nanites" would repair any injury. Hynes would also regularly compare himself to Superman.

263.   Hynes also sought to use deceit to make Hubbard addicted to meth and would give her what he claimed were "steroids" for her injuries. In fact, he was secretly giving Hubbard meth, a fact she only learned later.

264.   Hynes concealed his dosing of Hubbard with meth through the use of what he called "parachuting." He would empty prescription medication and replace the contents with meth. Hubbard only learned of this days before escaping Hynes.

*Hubbard Loses Her Home Due to the Venture and Moves in with Hynes*

265.   In March or April 2018, while still with Hynes, Hubbard's home was repossessed due to her heavily strained financial situation. Having nowhere else to go, Hubbard and Hynes both temporarily moved in with Hynes's parents. (A move which, among other things, required Hubbard to relinquish her service dog, who had become violent with Hynes.)

266.   Hynes's behavior continued to grow more erratic. He started to become jealous, constantly asking Hubbard how many people she had had sex with and becoming obsessed with the size of his penis, insisting that Hubbard tell Hynes that his was the largest penis she had ever seen.

267.   Hynes also insisted he had kicked his addiction to meth, which was an obvious lie. He would sometimes sneak out to his car to use meth,

1   or would go to hotels, including a local Motel 6 and American Inn, to use

2   drugs. He would often bring guns to these hotels and shoot them in the

3   room.

4       268.   In summer 2018, Hynes received a settlement for a car accident

5   he had suffered before meeting Hubbard. Hynes used the money to rent a

6   home in Hearst, Texas, where Hynes and Hubbard moved into in June or

7   July 2018.

8       269.   At about this time, it became apparent that Hynes was in regular

9   contact with Rick and would trade information on Hubbard's whereabouts

10  with him, so that Rick could assist in and benefit from Hynes forcing

11  Hubbard to sell drugs for his benefit, which constituted labor trafficking.

12      270.   At Rick's direction, Hynes also took Hubbard's driver's license

13  and phone, and took her credit cards, and further forced Hubbard to record

14  a series of videos apologizing to Rick, which Hynes provided to Rick.

15      271.   Hynes's behavior became even more erratic. He would begin to

16  threaten Hubbard with guns, including holding her at gunpoint and

17  demanding that Hubbard tell Hynes that she loved him, and that Hynes's

18  penis was bigger than Rick's.

19      272.   Hynes also forced Hubbard to "work" by selling cocaine and

20  other drugs at various clubs owned by Defendant RCI, called XTC and

21  Temptations, and Hynes would collect the money.

22      273.   In order to force Hubbard to comply with his demands, Hynes

23  would regularly beat Hubbard, giving her multiple black eyes, choking her

24  regularly, and holding a gun to her head. Hynes would also throw Hubbard

25  around the house with such force that it would damage the walls.

26      274.   Attempting to escape her situation, Hubbard would regularly

27  ask Hynes's father, Hynes, Sr., for help, as well as calling the Fort Worth

28  Police Department. However, Hynes, Sr., insisted that his son could not be

doing anything wrong. The Fort Worth Police Department similarly refused to take any action or even investigate Hubbard's reports, evidently based on statements from Hynes, Sr., that Hubbard was not credible.

275. Hynes, Sr., would also periodically tell Hubbard that if she continued to accuse his son, he would "call Rick" and Rick would "come get [her]."

276. Hynes's behavior became increasingly extreme, sending Hubbard to the hospital multiple times. On one visit, Hynes arranged Hubbard to be drug tested and Hynes or his parents sent the results to Rick, apparently at Rick's request to use as further leverage to threaten to custody of Hubbard's children.

277. Eventually, in late October or early November 2018, Hynes tied Hubbard to a bed and kept her restrained for three days, releasing her only to use the restroom. While tied up, Hynes would smoke methamphetamine and blow the smoke in Hubbard's face in an attempt to addict her to the drug.

278. In order to prevent her escape, Hynes stabbed Hubbard in her toes with broken glass so that even if she untied herself while he was gone, she would have difficulty walking. Hynes then left Hubbard alone. At this time, Hubbard had no identification, no credit cards, no cash, no food, the power had been shut off for lack of payment, and no phone, leaving her no way to seek help.

279. Eventually, after three days left alone tied to the bed, Hubbard was able to attract the attention of construction workers outside. One of the workers helped Hubbard and brought her a phone. This allowed Hubbard to call for help and be taken to a hospital for treatment.

*Plaintiff Goedinghaus Meets Rick*

280.  Meanwhile, in November 2018, Plaintiff Goedinghaus was going through a difficult divorce.

281.  One couple introduced her to Rick. He at first appeared highly charming and Goedinghaus felt as though Rick truly cared for her. He presented himself as a "hero" to her. Rick provided Goedinghaus with a job at his company with less demanding hours so that Goedinghaus could spend more time with her daughter.

282.  By December 2018, Goedinghaus had moved in with Rick at 1605 Grayford Drive, Austin, Texas. They shortly thereafter became engaged, although they never married as they were both still married to other people (Hubbard in Rick's case) at the time. (Later, in April 2019, they would move to Defendant Rogers's property at 28827 Fine Road, Marble Falls, Texas).

283.  After Goedinghaus confided in Rick of past sexual abuse, Rick introduced Goedinghaus to Defendant Eller, whom he claimed was the "best" psychologist, and told Goedinghaus that Eller was the "life coach" of famed motivational speaker Tony Robbins.

284.  Goedinghaus began having phone calls with Eller one a week beginning in January or February 2019.

285.  Eller first presented himself as a therapist and life coach. However, it gradually became apparent that Eller had an ulterior motive in his role in the Venture, and Eller began insisting that Goedinghaus needed medication and needed to stay with Rick because he provided a highly supportive environment for her.

*The Venture Traffics Goedinghaus*

286.   In February 2019, Rick began forcing Goedinghaus to perform sex acts, including with Scott Brunson in Austin, Texas, and then with Ralph Rogers in the summer of 2019 in exchange for Rick to avoid an eviction.

287.   Rick would also force Goedinghaus to attend sex clubs, including one called Friends, where he forced Goedinghaus to walk around naked, have public sex with Rick, or a woman that Rick found, while others watched. At one of these parties in Austin, Goedinghaus was forced to have sex with a woman while twenty men watched her and masturbated. Rick further forced Goedinghaus to find women at these parties, who Rick would also force to perform sex acts.

288.   Rick would force Goedinghaus to perform these forced commercial sex acts by beatings, choking (on at least twenty-five occasions, often until she was unconscious), threats, and drugs procured by the assistance of Defendants Eller and Miller.

289.   At times, after being choked unconscious, Goedinghaus would wake to Rick raping and sodomizing her.

290.   Rick would also force Goedinghaus to perform labor, in the form of helping Rick to "run" his fraudulent companies—through this, Goedinghaus quickly realized that Rick's companies were false fronts for the Venture to receive money.

291.   Rick would also tell Goedinghaus disturbing stories, such as fantasies about raping and killing people, and even told Goedinghaus that he had once killed someone. He also would speak of how he wished he had been a Navy SEAL and would sometimes disappear for days without explanation, and claim that he was himself a military contractor and a "mercenary killer" for the United States government. He would often return some mornings covered in dirt and mud. Rick also had a prominent tattoo

on his left hand of the Roman numeral III encircled in a ring of stars — the insignia of the "Three Percenters," a far-right extremist organization signifying his connection to the group.

292.   Rick also told Goedinghaus that he was "turned on" when she cried and would regularly take large doses of the drug Trimix — which gave Rick an extreme erection — and then force Goedinghaus to have sex with him, which he called "sport fucking". Rick also spoke of hiring someone to violently rape Goedinghaus while he watched. Rick also occasionally took GHB, which has similar effects.

293.   Rick would also use Eller as a threat, both due to his influence (as a prominent psychologist and his supposed connection to Tony Robbins) and his control of the drugs prescribed. When Goedinghaus would show sign of resistance, Rick would withhold drugs. On one occasion, he forced Goedinghaus into Xanax withdrawal which caused her to have serious seizures. Rick then forced Hubbard's daughter (who still lived with Rick at the time) to hold a belt in Goedinghaus's mouth to prevent her from biting her tongue.

294.   Rick also trafficked Goedinghaus to the Investor Defendants, as set forth above.

295.   On one occasion, Rick forced Goedinghaus to attend a Forced Sex Party at Defendant Crow's house on July 20, 2019, which was Goedinghaus's birthday. Rick instructed Goedinghaus to "seduce" either Crow or his son, and to "try to get pregnant." At that party, Rick also forced Goedinghaus to have sex outside of Crow's house where Rick would watch, and when he thought Goedinghaus may not comply he choked her and threatened her with Crow's influence.

296.   Following this Forced Sex Party, Rick and Goedinghaus stayed in Crow's guest house for several days.

297.  On another occasion, in September 2019, Rick severely beat and choked Goedinghaus before forcing her to attend the bachelor party of Fixer Defendant Knewitz. This took place at a strip club, where Rick forced Goedinghaus to perform sex acts with the club's dancers for the enjoyment of Knewitz, Rick, and other guests.

298.  Following the bachelor party, while staying in an AirBnB, Rick again choked Goedinghaus until she was unconscious (in part, for not finding other women to have sex with him), and Goedinghaus woke up to see Rick taking off her pants, and Goedinghaus began sobbing.

299.  After this, Goedinghaus sought to leave the wedding, but Knewitz, still carrying out his role as fixer for the Venture, convinced Goedinghaus to stay for the wedding. This time, Goedinghaus was so reluctant that Rick and Knewitz had to resort to threats of having Goedinghaus arrested and her child taken away.

300.  Goedinghaus attended the wedding, but afterwards left Rick. Goedinghaus escaped to SAFE, a domestic violence shelter, in Austin.

301.  After leaving, Rick continued to follow Goedinghaus, and Goedinghaus even found tracking devices in her car.

302.  However, Goedinghaus contacted law enforcement, and caused Rick to be arrested on harassment charges while obtaining a lifetime order of protection against Rick (as Hubbard also later obtained).

### The Venture Affected Interstate Commerce

303.  The Venture relied on the essential work of Defendant Eller, based in this District in Santa Monica, California, who regularly communicated with Rick in Texas.

304.  Eller also submitted false affidavits and testimony to courts in Texas.

54

305.  Eller also knowingly caused the Medical Doctor Defendants, who resided at relevant times in Texas, to improperly issue controlled substances to the Venture.

306.  Such communication, affidavits, testimony, and procurement of procured substances was foundation to the unlawful activities of the Venture.

307.  In addition, payments were made to support the Venture and in exchange for its forced commercial sex act via Square, wire transfer, and other electronic means.

308.  In addition, the Venture affected interstate commerce because the market for sex workers is national.

**The Enterprise Engaged in Numerous Unlawful RICO Predicate Acts**

309.  The Enterprise, which consisted of all Defendants, committed a number of predicate acts that proximately harmed Plaintiffs.

310.  These predicate acts included the following, which are further detailed in the RICO statement filed concurrently with this Complaint.

- **Violation of the Trafficking Victims Protection Act** (18 U.S.C. §§ 1591, 1589): As described herein (*see* paragraphs ¶¶ 5, 8, 9, 13, 15, 17, 18, 21, 26–28, 34, 35, 38, 40, 43, 45–50, 120–126, 132, 134, 136, 139, 141–143, 146, 147, 150, 152, 155–158, 183–185, 187–190, 192–194, 197–199, 201–203, 205–207, 2019–212, 214–217, 220–223, 225, 228, 232–237, 245–247, 249, 251, 254, 258, 264, 267–269, 281–285, 287, 288, 290, 292, 294), all Defendants participated in and benefitted from the Venture and its acts of sex and labor trafficking, in violation of 18 U.S.C. §§ 1591 and 1589.

- **Violation of the Controlled Substances Act** (21 U.S.C. § 801, *et seq.*): As described herein (*see* paragraphs ¶¶ 8, 13, 25, 34, 40, 48, 121, 125, 144, 145, 183, 192, 254, 262, 264, 267), the Enterprise relied

on and profited from the unlawful dealing, use, and distribution of numerous controlled substances, including at least Xanax, Adderall, Oxycodone, cocaine, GHB, MDMA, Vicodin, and Benzodiazepine.

- **Wire Fraud** (18 U.S.C. § 1343): As described herein (*see* paragraphs ¶¶ 8, 14), the Enterprise engaged in a scheme to defraud by means of false statements transmitted by means of interstate wires. Specifically, Defendant Eller engaged in such wire fraud in order to force Plaintiffs to engage in commercial sex acts.

- **Witness Tampering** (18 U.S.C. § 1512): As described herein (*see* paragraphs ¶¶ 12, 20, 158), the Enterprise relied upon threats of physical force in order to hinder, delay, and/or prevent the communication to law enforcement officers information concerning the omission of a federal offense. Specifically, the Venture repeatedly threatened, particularly through the involvement of Defendant Texas Ranger Mitchell, Plaintiffs in order to discourage them from contacting law enforcement regarding the acts of the Venture.

311.   These predicate acts proximately harmed Plaintiffs as these acts were essential to the Venture and Enterprise and resulted in Plaintiffs suffering financial harm, including the loss of earnings.

312.   These damages include, but are not limited to, moneys that Hubbard and Goedinghaus earned for providing companionship, including at Forced Sex Parties, and moneys that Hubbard earned work at Silver City Cabaret.

313.   These predicate acts were committed by Defendants as part of an open-ended continuity Enterprise, where the criminal conduct will be repeated and extend indefinitely, and which will continue to generate a

pattern of racketeering activity for the foreseeable future. There exists a threat of such activity continuing.

314. In the alternative, these predicate acts were also committed by Defendants as part of a closed-ended continuity Enterprise, where the criminal conduct began in August 2012 and concluded on or around September 2019—this period, constituting more than five years, was a substantial period of time, and the enterprise targeted multiple victims.

315. The Enterprise had a legitimate non-criminal purpose, specifically facilitation of entertainment, companionship, and networking at social functions, which Defendants corrupted to their criminal ends.

316. The first predicate act of the Enterprise currently known to Plaintiffs occurred on or around August 2012.

317. The last predicate act of the Enterprise currently known to Plaintiffs occurred no earlier than September 2019, but Plaintiffs believe that the Enterprise is continuing.

## CAUSES OF ACTION

**COUNT ONE: VIOLATION OF HUMAN TRAFFICKING LAWS, 18 U.S.C. § 1591(a)**

**(SEX TRAFFICKING)**

**AGAINST ALL DEFENDANTS**

318. Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

319. Defendants knowingly affected interstate commerce by recruiting, enticing, harboring, transporting, obtaining, maintaining, and/or soliciting Plaintiffs and others by any means knowing—or in reckless disregard of the fact—that Rick and other members of the Venture would use means of force, threats of force, fraud, and coercion to cause Plaintiffs and others to engage in commercial sex acts.

320. Further, all Defendants benefited, financially or by receiving something of value, from participating in a venture which has engaged in recruiting, enticing, harboring, transporting, obtaining, maintaining, and/or soliciting Plaintiffs and others by any means knowing—or in reckless disregard of the fact—that Rick or others in the Venture would use means of force, threats of force, fraud, and coercion to cause Plaintiffs and others to engage in commercial sex acts.

321. As a direct result of Defendants' violations of 18 U.S.C. § 1591(a), Plaintiffs each suffered serious injury and damages in an amount to be determined at trial.

**COUNT TWO: VIOLATION OF HUMAN TRAFFICKING LAWS, 18 U.S.C. § 1589**

**(LABOR TRAFFICKING)**

**AGAINST ALL DEFENDANTS**

322. Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

323. Defendants knowingly provided or obtained the labor or services of Plaintiffs by (a) means of force, threats of force, physical restraint, or threats of physical restraint; (b) means of serious harm or threats of serious harm to that person or another person; (c) means of the abuse or threatened abuse of law or legal process; or (d) means of any scheme, plan, or pattern intended to cause Plaintiffs to believe that, if Plaintiffs did not perform such labor or services, Plaintiffs or another person, including Plaintiffs' children, would suffer serious harm or physical restraint.

324. Further, all Defendants benefitted, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by prohibited means, knowing

or in reckless disregard of the fact that the Venture had engaged in the providing or obtaining of labor or services by such prohibited means.

325. As a direct result of Defendants' violations of 18 U.S.C. § 1589, Plaintiffs each suffered serious injury and damages in an amount to be determined at trial.

## COUNT THREE: VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c) (PATTERN OF RACKETEERING) AGAINST ALL DEFENDANTS

326. Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

327. All Defendants have acted in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) to the detriment of Plaintiffs.

328. At all times relevant to these allegations, all Plaintiffs and all Defendants were "person[s]" within the meaning of 18 U.S.C. § 1961(3).

329. Defendants came together to form an association in fact Enterprise.

330. At all times relevant to the above allegations, the Enterprise had a legitimate non-criminal purpose, specifically facilitation of entertainment, companionship, and networking at social functions.

331. However, this legitimate purpose was subverted by the Enterprise's illegal acts and violations of federal laws.

332. In the case of each Plaintiff, the Enterprise relied on the work of Eller and other members of the Enterprise in Texas, affecting interstate commerce.

333. Defendants engaged in activities which constitute "racketeering activity," including violation of the Trafficking Victims Protection Act (18

U.S.C. §§ 1591, 1589), violation of the Controlled Substances Act (21 U.S.C. § 801, et seq.), wire fraud (18 U.S.C. § 1343), and witness tampering (18 U.S.C. § 1512), within the meaning of 18 U.S.C. § 1961(1).

334.   Defendants engaged in multiple predicate acts amounting to a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

335.   Plaintiffs were damaged by Defendants' violation of 18 U.S.C. § 1962(c) in an amount to be determined at trial.

## COUNT FOUR: VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d) (RICO CONSPIRACY)
### AGAINST ALL DEFENDANTS

336.   Plaintiffs repeat and reallege the allegations made above as if fully set forth herein.

337.   All Defendants have acted in violation of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(d) to the detriment of Plaintiffs.

338.   At all times relevant to these allegations, Plaintiffs and all Defendants were "person[s]" within the meaning of 18 U.S.C. § 1961(3).

339.   All Defendants conspired to violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) by associating in fact to create an Enterprise which then engaged in a pattern of racketeering activity resulting in injury to Plaintiffs.

340.   The period of the conspiracy began as early as August 2012, and continued at least until September 2019, and likely is continuing today.

341.   The object of the conspiracy was to traffic women for purposes of sexual acts and forced labor, to the financial benefit of Defendant Rick Hubbard, Defendant Eller, and the Medical Doctor Defendants and for the sexual gratification and other benefits of all Defendants.

342. Each predicate act committed by the Enterprise was in furtherance of the conspiracy.

343. The predicate acts caused physical and emotional injury to Plaintiffs, in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray that this Court enter judgment against Defendants as follows:

(a)    Compensatory and punitive damages for each Plaintiff in an amount to be determined at trial, but in an amount no less than $75,000;

(b)    Compensatory damages plus trebling for each Plaintiff for injuries caused by the Enterprise and its individual members;

(c)    A permanent injunction enjoining Defendants, their partners, subsidiaries, agents, servants, and employees, and all persons acting under, in concert with them directly or indirectly, or in any manner, from in any way engaging in the Enterprise of any of the practices or crimes set forth herein;

(d)    Imposition of a constructive trust upon all assets associated with the Enterprise;

(e)    Punitive damages;

(f)    Cost of suit and attorneys' fees pursuant to Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c);

(g)    Attorneys' fees pursuant to the civil remedy for human trafficking in 18 U.S.C. § 1595(a);

(h)    Applicable interest on the foregoing amounts; and

(i)    Such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand trial by jury on all issues so triable.

Dated: New York, New York

        November 1, 2022

By: _____

       John G. Balestriere*

       Matthew W. Schmidt (Cal. Bar No. 302776)

       **BALESTRIERE FARIELLO**

       225 Broadway, 29th Floor

       New York, New York 10007

       Telephone:      (415) 966-2656

       Facsimile:      (212) 208-2613

       john.balestriere@balestrierefariello.com

       matthew.schmidt@balestrierefariello.com

       *Attorneys for Plaintiffs*

       *Pro hac vice application forthcoming*

       Anastasia Mazzella (Cal. Bar. No. 245201)

       **KABATECK LLP**

       633 West Fifth Street, Suite 3200

       Los Angeles, California 90071

       Telephone: (213) 217-5007

       Facsimile:   (213) 217-5010

       am@kbklawyers.com

       *Attorneys for Plaintiffs*